NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RUDY V. UNDERDUE, | : |
| Petitioner, | : |
| v. | : |
| KENNETH NELSON, et al., | : |
| Respondents. | : |

Civil Action No. 13-6497 (RMB)

| | |
|---|---|
| RUDY V. UNDERDUE, | : |
| Petitioner, | : |
| v. | : |
| THE ATTORNEY GENERAL OF | : |
| THE STATE OF NEW JERSEY, et al., | : |
| Respondents. | : |

Civil Action No. 13-5486 (RMB)

**OPINION**

**APPLIES TO BOTH ACTIONS**

**BUMB, District Judge:**

These two matter come before the Court upon Petitioner's letter filed in <u>Underdue v. Att'y Gen. of the State of NJ</u>, Civil Action No. 13-5486 ("<u>Underdue-I</u>"), which triggered restoration of that matter to the Court's active docket. <u>See Underdue-I</u>, Docket Entries Nos. 7 and 8. Petitioner commenced his <u>Underdue-I</u> matter by filing a § 2254 habeas petition without submitting his filing fee or <u>in forma pauperis</u> application. <u>See id.</u> Docket Entry No. 2. This Court, therefore, denied him <u>in forma pauperis</u> status

without prejudice and issued Petitioner a notice under <u>Mason v. Meyers</u>, 208 F.3d 414 (3d Cir. 2000).  <u>See</u> <u>id.</u>

In response, Petitioner submitted his filing fee in <u>Underdue-I</u> and, in addition, commenced <u>Underdue v. Nelson</u>, Civil Action No. 13-6497 ("<u>Underdue-II</u>"), where he also submitted a § 2254 petition and his filing fee.  <u>See</u> <u>id.</u> Docket Entry No. 3. Correspondingly, this Court directed the Clerk to terminate <u>Underdue-II</u> as duplicative of <u>Underdue-I</u>, and to remit to Petitioner his <u>Underdue-II</u> filing fee.  <u>See</u> <u>id.</u>  In conjunction with the foregoing, this Court directed Petitioner to verify that the § 2254 pleading submitted in <u>Underdue-II</u> was intended to operate as his all-inclusive petition for the purposes of <u>Underdue-I</u>.  <u>See</u> <u>id.</u>  Petitioner so verified, and this Court directed the Clerk to restore <u>Underdue-I</u> to this Court's active docket, <u>see</u> <u>id.</u> Docket Entries Nos. 7 and 8, and read Petitioner's all-inclusive petition, <u>Underdue-I</u>, Docket Entry No. 4 ("Petition"), against the record accrued in Petitioner's state proceedings.  <u>See</u> <u>State v. Underdue</u>, 2008 N.J. Super. Unpub. LEXIS 1795 (N.J. Super. Ct. App. Div. Nov. 26, 2008) (the decision issued by the Superior Court of New Jersey, Appellate Division, listing Petitioner's state claims raised on direct appeal).[1]

─────────────────

[1]  Although Petitioner pursued post-conviction relief ("PCR"), and had his PCR claims denied by his trial court (which denial was affirmed by the Appellate Division, and certification

Comparing Petitioner's instant § 2254 claims to the dispositions reached by the Appellate Division on direct appeal, this Court detected that: (a) two out of Petitioner's three claims raised here markedly differed from the claims he could have conceivably raise in a § 2254 proceeding; and (b) the remaining, _i.e._, the third, § 2254 claim was facially meritless.

Hence, for the reasons detailed _infra_, the facially meritless claim will be dismissed _sua_ _sponte_.  In addition, one of the two claims that markedly differ from the challenges Petitioner could conceivably raise here will also be dismissed _sua_ _sponte_ since that difference: (a) does not prevent this Court from conclusively determining the nature of that particular challenge; and (b) that challenge facially warrants no relief.  However, this Court will allow Petitioner an opportunity to: (a) restructure his remaining claim (_i.e._, the other claim that markedly differs from the challenges he could conceivably raise here) in a fashion corresponding to the disposition reached by the Appellate Division; or (b) withdraw that claim, if Petitioner so desires.  Hence, this Court will deny Petitioner a certificate of appealability as to the two claims being dismissed _sua_ _sponte_, but the Court will reserve, until its final disposition of this

---

was denied by the Supreme Court of New Jersey), Petitioner's PCR challenges have nothing in common with the claims raised in his all-inclusive Petition pending before this Court.  Therefore, his PCR proceedings are of no relevance to the issues at bar.

matter, its determination as to whether a certificate of
appealability shall issue as to the remaining claim.


I.     **BACKGROUND**

    A.     <u>**Investigation of the Events Underlying Conviction**</u>

    The Appellate Division described the relevant events in
<u>Underdue</u>, 2008 N.J. Super. Unpub. LEXIS 1795, at *3-7.  It stated
that, on August 30, 2003, local police received a report that
blood was dripping from a 1990 gray Honda Accord parked in Camden
near Broadway and Mt. Vernon Street.  The police went to that
location and located the car.  Examining the vehicle, the
officers noticed an odor of decomposition and numerous flies
buzzing around the trunk.  The officers opened the trunk and
discovered a human body wrapped in a bed sheet.  Using a missing
person report filed in Bronx, New York, the officers identified
the body as that of Richard Mora-Batista ("Mora-Batista").[2]  An
examination of Mora-Batista's body indicated that he had been
shot multiple times.  The police interviewed Bonilla, and she
told them that Mora-Batista went to Camden on August 26, since he
planned to go to 1135 South 8th Street in order to meet with
someone whom Bonilla knew only as "Rudy."  According to Bonilla,
after an unsettled argument over the price of a kilogram of

---

    [2]  The missing person report was filed by Mora-Batista's
girlfriend, Letty Bonilla ("Bonilla").

cocaine that had been supplied by Mora-Batista to Rudy,
Mora-Batista took a handgun and went to Camden to reclaim the
drugs.[3]

In continuation of their investigation, the officers spoke
to yet another witness, Luis Legarde-Rios ("Legarde-Rios"), who
lived at 1137 South 8th Street and who identified Mora-Batista as
someone who frequently drove a 1990 Honda Accord to visit the
house next door, always carrying packages into that house,
staying just a few minutes and then leaving.  Legarde-Rios stated
that he saw Mora-Batista arrive on August 26 and go into the
house next door, but he never saw Mora-Batista leave.  Rather,
Legarde-Rios saw two men who entered the house and, later that
day, his neighbor (known to Legarde-Rios as "Rudy") gave him his
cell phone number with it by a request to call Rudy if
Legarde-Rios would see any police activity in the neighborhood.

Legarde-Rios also told the officers that, shortly
thereafter, he saw Rudy and his girlfriend, Victoria Caban
("Vicki"), place two large boxes in Vicki's white truck.  He also
stated that, on August 29, he saw Rudy and two other men arrive
at 1135 South 8th Street in the white truck, and he overheard
Rudy telling those men to remove the living room carpet and to

---

[3]   Another witness, Diocelin Berroa ("Berroa"), who
accompanied Bonilla for the interview with the police, told the
police that Mora-Batista left in the gray Honda Accord.

call him when they were done.  In the evening, Legarde-Rios saw
Rudy change the locks on the front door of the house and carry a
rolled-up carpet into Vicki's white truck.  The investigators
also met with Vicki's former boyfriend who told them that she had
mentioned to him being scared because of something that had
happened at the house.  Investigator Diane Wilson ("Wilson") of
the Camden County Prosecutor's Office, who was informed of and
involved in the investigation, went to the house together with
police officers out of concern for Vicki's safety.

Wilson and the officers knocked on the door, but there was
no response.  The officers went to the rear of the house and
found the back door partially open.  Wilson and the officers drew
out their weapons and entered the house upon announcing their
presence and calling out for Vicki.  Going from room to room,
they saw a living room without a carpet and a fitted bed sheet
that matched the flat bed sheet in which Mora- Batista's body was
wrapped; they also noticed that the fitted bed sheet looked as if
it had some items gathered within it.

Realizing that Vicki (or her body) was not in the house,
Wilson and police officers left through the open back door.
Wilson applied to a state judge for a search warrant to conduct a
complete forensic search of the house.  The last three paragraphs
of her affidavit (executed in support of her application for the
warrant) described why and how she and the officers went into the

house, what they saw and that they left upon not finding Vicki
and not conducting any search.  The search warrant was duly
issued, and on September 1, 2003, Wilson and other investigators
returned to the house and conducted a complete forensic search,
seizing the bed sheet and other evidence (hereinafter,
collectively, "Additional Evidence").

B.     **Petitioner's Arrest and Statements to Police**

After Petitioner was arrested in Florida on drug charges
(unrelated to the Mora-Batista homicide), it was determined that
he was also the person sought in connection with the Mora-Batista
investigation.  Therefore, Wilson went to Florida and interviewed
him on September 7, 2003, while he was still held in a Florida
jail.  She read him his Miranda v. Arizona, 384 U.S. 436 (1966),
rights from a form, and Petitioner responded that he understood
his rights and signed the form.  He also stated that he was
waiving those rights and was willing to speak to Wilson.  The
interview lasted approximately three hours; during it, Petitioner
kept making conflicting oral statements regarding his knowledge
of Mora-Batista and the homicide.  This chain of incoherences in
Petitioner's statements prompted Wilson to tell him "that his
story wasn't believable," especially in light of other evidence
already collected in the case.  In response, Petitioner continued
with the interview and changed his story once again.  At no point

did he indicate that he wished to stop the interview, leave the room or even speak to an attorney.

Petitioner was then was extradited from Florida to New Jersey to face terroristic threats charges unrelated to the Mora-Batista homicide.  When he arrived to New Jersey, the investigation of the Mora-Batista homicide continued, and Lieutenant Arthur Folks ("Folks") of the prosecutor's office went to the jail where Petitioner was placed, took Petitioner into custody and brought him to the prosecutor's office for an interview.  Folks read Petitioner his <u>Miranda</u> rights from a form, and Petitioner again indicated tat he understood his rights, signed the form, and agreed to waive those rights and to speak to Folks.  Therefore, Folks recapped the statements Petitioner made to Wilson and, reflecting on those statements and evidence already collected in the case, also commented that Petitioner's statements were not believable.  With that, Folks stated to Petitioner that it was in Petitioner's "best interests" to tell the truth.  Eventually, Petitioner agreed to make a taped statement, and Folks assisted Wilson in producing that tape. That taped statement was later introduced into evidence during Petitioner's trial.  <u>See</u> <u>id.</u> at *16-17.

Eventually, Petitioner was indicted and charged with the Mora-Batista homicide and other offenses related to that homicide.        **C.    <u>Petitioner's Trial-Level Motions to Suppress</u>**

### 1.  Additional Evidence

During Petitioner's pre-trial motion practice, he made
suppression motions.  For instance, he moved for suppression of
Additional Evidence.  Essentially, he argued that Additional
Evidence seized on the basis of the warrant had to be deemed
inadmissible because, in Petitioner's opinion, the warrant itself
was improperly obtained since Wilson's affidavit included
paragraphs describing what Wilson and the officers saw upon their
August 31 entry into his house (when Wilson and the officers were
looking for Vicki).  Petitioner maintained that the entry was
made without probable cause.  The trial court held a suppression
hearing and allowed the prosecutor an opportunity to present
Wilson's testimony reflecting on her and the officers' entry of
the house on August 31.  Wilson's hearing testimony about her
entry into the house and the investigation conducted prior to
August 31 was substantively identical to the statements made in
her affidavit.[4]

Being questioned by the trial judge, Wilson stated that she
developed sufficient probable cause to apply for a warrant even
before she entered the premises and saw the bed sheet and removed
carpet but she and the officers had to hurry to the house out of

---

[4]  Wilson verified that, on August 31, she went to the house
believing that Vicki's life was in danger.  She also reflected on
the investigation efforts that took place on August 30 and 31
before she and the officers entered the house.

concern for Vicky's life.[5]  The trial judge found that Wilson was
a credible witness, that there was a reasonable basis to conclude
that, as of August 31, she obtained sufficient probable cause to
seek a search warrant of the house since the information obtained
from Legarde-Rios, with that provided by Bonilla, Berroa and the
data collected by the officers, in toto, established the required
evidence needed for establishing probable cause.  Thus, the trial
judge concluded that the warrant was duly obtained.[6]
Correspondingly, he denied Petitioner's motion to suppress.
See id. at *7-11.

### 2.   Statements to Investigators

In addition to moving for suppression of Additional
Evidence, Petitioner also moved for suppression of his taped and
oral statements to Wilson and Folks.  He argued that he did not
make a knowing, informed and voluntary waiver of his Miranda
rights prior to making these statements because his "will was
overborne" by Wilson and Folks, and the locales where he was
interviewed, i.e., the Florida jail and the Camden County
Prosecutor's Office, were "inherent[ly] coercive" environments.

---

[5]  Wilson clarified that the information she obtained after
her August 31 entry into Petitioner's house merely buttressed the
position she stated in her affidavit but was in no event decisive
for the purposes of establishing the required probable cause.

[6]  In addition, the trial judge found that the August 31
entry was justified under the emergency aid doctrine, in light of
Wilson's bona fide concern for Vicki's life.

Id. at *16 (brackets omitted).  The trial court disagreed and
allowed introduction of Petitioner's statements into evidence.

     D.   **Trial and Post-trial Developments**

        1.   **Stipulations and Trial Court's Instructions**

Ultimately, Petitioner had a jury trial.  During the trial,
at the conclusion of the State's case in chief, four stipulations
were read to the jury.  First, the State and Petitioner
stipulated that, in the event the medical examiner who performed
the autopsy on Mora-Batista's body had been called as a witness,
the examiner would have opined that Mora-Batista had died from
gunshot wounds.  Second, the State and Petitioner stipulated
that, if Sergeant Cowden of the New Jersey State Police
Ballistics Unit had been called as a witness, he would have
testified as to certain findings with regard to the bullets and
bullet fragments recovered by the investigators.  Third, the
State and Petitioner stipulated that, had Tracey Pursell, an
employee of the State Police Special and Technical Services
Section, been called as a witness, she would have testified that
certain forensic specimens obtained from Petitioner's house
tested positive for the presence of blood.  Finally, the fourth
stipulation was that had Jennifer Thayer of the State Police
Forensic Sciences DNA Laboratory had been called as a witness,
she would have testified that these forensic specimens were

11

subjected to DNA testing, but those tests were inconclusive for various reasons.  See id. at *17-18.

After these stipulations were read into the record, the trial judge gave the jurors an instruction that the jurors were the "triers of fact . . . except when it comes to stipulations." Id. at *18-19 (brackets omitted, indicating that the trial judge stated to the jury, "You have to accept the contents of each of those four stipulations as being true").  The judge repeated the same instruction as part of his final jury charge.  See id. at *19.

At the end of the jury charge, the trial judge also stated:

It's five after 3:00.  I am not going to hold you here past 5:00 o'clock.  There is supposed to be some kind of snow tonight.  So, if you have not reached your verdict by then, I would ask you to come back tomorrow morning and continue in deliberations.

Id. (also indicating that the jury returned the verdict at 5:01).

### 2. Conviction and Sentence

The jury found Petitioner guilty of aggravated manslaughter, firearm offenses and hindering apprehension.  See id. at *1.  He was sentenced to a twenty-seven year term on the aggravated manslaughter conviction (with an 85% parole disqualifier pursuant to the No Early Release Act) and two concurrent four-year terms based on his other offenses related to the Mora-Batista homicide. See id.

12

### 2.   Direct Appellate Proceedings

Petitioner filed a direct appeal raising six groups of challenges, of which only the first three are relevant here. Those three direct appellate challenges alleged:

POINT I   THE [TRIAL] COURT ERRED IN DENYING [Petitioner's}
          MOTION TO SUPPRESS [ADDITIONAL EVIDENCE BECAUSE]
          (A)  [THE TRIAL] COURT . . . FOUND THAT THE "FOUR
               CORNERS" OF [WILSON'S] AFFIDAVIT DID NOT
               PROVIDE JUSTIFICATION FOR THE [AUGUST 31]
               ENTRY INTO [HIS HOUSE, AND THE TRIAL] ABUSED
               ITS DISCRETION [BY] CONSIDER[ING] THE
               INFORMATION [ABOUT WHAT WILSON SAW DURING HER
               AUGUST 31 ENTRY].
          (B)  [THE TRIAL] COURT ABUSED ITS DISCRETION IN
               [QUESTIONING WILSON DURING THE SUPPRESSION
               HEARING].
          (C)  [THE TRIAL] COURT ABUSED ITS DISCRETION IN
               APPLYING THE "EMERGENCY AID" EXCEPTION TO
               [WILSON'S AUGUST 31 ENTRY].

POINT II  THE TRIAL COURT ERRED IN DENYING [PETITIONER'S]
          MOTION TO SUPPRESS THE STATEMENTS HE MADE TO
          [WILSON] IN FLORIDA ON SEPTEMBER 7, 2003 AND IN
          THE PROSECUTOR'S OFFICE ON SEPTEMBER 17, 2003.

POINT III THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING
          TO INSTRUCT THE JURY THAT IT COULD REJECT THE
          STIPULATIONS THAT WERE READ INTO THE RECORD.

Id. at *2 and 19 (capitalization in original, also indicating that Petitioner's Point III argued that the comment about the snow "had the capacity to coerce the jury to return its verdict before the end of the day").

The Appellate Division dismissed Petitioner's challenges. See, generally, id. at *11-25.  Notably, it affirmed the trial court's legal reasoning, and its application of law to the facts

13

of Petitioner's case, only with regard to his Points II, while affirming the trial court's conclusions with regard to Points I and III solely in terms of their outcomes, not the trial court's legal reasoning.  See id. (offering different rationales for those outcomes and pointing out that Petitioner misunderstood/ misrepresented the very nature of the trial court's findings as to Point I).

**II.  STANDARD OF REVIEW**

The standard of federal habeas review is long-established, and it sets forth a narrowly-tailored test.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("As amended by [the Antiterrorism and Effective Death Penalty Act ('AEDPA'), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996)], 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner").  Section 2254 permits a federal court to entertain only claims alleging that a person is held in state custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA further limits a federal court's authority to grant habeas relief by providing that, when a state court has adjudicated a petitioner's federal claim on the merits, a district court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or

14

involved an unreasonable application of, clearly established
Federal Law, as determined by the Supreme Court of the United
States,' or 'was based on an unreasonable determination of the
facts in light of the evidence presented in the state court
proceeding.'"  Parker v. Matthews, 132 S. Ct. 2148, 2151 (2012)
(quoting 28 U.S.C. § 2254(d)).[7]  Notably, under § 2254(d)(1), "an
unreasonable application of federal law is different from an
incorrect application of federal law."  Harrington v. Richter,
131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410).
Correspondingly, the standard posed by federal habeas review "is
. . . difficult to meet, [since it is a] highly deferential
standard for evaluating state-court rulings, [and that standard]
demands that state-court decisions be given the benefit of the
doubt."  Cullen, 131 S. Ct. at 1398 (citations and internal
quotation marks omitted).  Moreover, the challenges raised in
federal habeas review must be the claims attacking the state
determinations entered by the highest level of the state court

---

[7]  Clearly established law "refers to the holdings, as
opposed to the dicta, of [the Supreme Court's] decisions [entered
by] the time of the relevant state-court decision."  Williams v.
Taylor, 529 U.S. 362, 412 (2000); accord Lockyer v. Andrade, 538
U.S. 63, 71 (2003).  A decision is "contrary to" a Supreme Court
holding, within the meaning of 28 U.S.C. § 2254(d)(1), if: (a)
the state court outright "contradicts the governing law set forth
in [the Supreme Court] cases"; or (b) the state court "confronts
a set of facts that are materially indistinguishable from a
decision of th[e Supreme] Court and nevertheless arrives at a
[different] result."  Williams, 529 U.S. at 405-06.

(in the event those determinations differ from the findings reached by the lower level(s) of the state court).  <u>See</u> <u>Crumbs v.</u> <u>Balicki</u>, 2011 U.S. Dist. LEXIS 140603, at *3 (D.N.J. Dec. 7, 2011) ("The rationale of the 'substantial equivalent' [between the surviving state claims and federal habeas claims] is self-evident in light of the standard of review applicable to federal habeas actions: habeas relief focuses on whether the state court's adjudication of the petitioner['s] claim 'resulted . . . or involved an unreasonable application of . . . Supreme Court precedent'") (quoting 28 U.S.C. § 2254(d)).  Simply put, if a litigant's legal argument was deemed meritorious but the litigant's claim was denied on the basis of a different, alternative ground, the litigant has to establish that the denial of his/her claim on the basis of *that alternative ground* was an unreasonable application of Supreme Court precedent.

**III. CLAIMS RAISED IN THE INSTANT MATTER**

Here, Petitioner raised three Grounds:

GROUND ONE: THE STATE COURT ERRED IN FAILING TO
SUPPRESS ILLEGALLY EVIDENCE SEIZED UNDER THE "FRUIT OF
THE POISONOUS TREE" DOCTRINE, AND CIRCULARLY,
PERMITTING THE PROSECUTOR TO SUPPLEMENT THE RECORD WITH
IN-COURT TESTIMONY CONCERNING AN ANTECEDENT ILLEGAL
WARRANTLESS SEARCH OF A RESIDENCE IMPROPERLY
SUPPLEMENTED THE "FOUR CORNERS" OF AN AFFIDAVIT OF
PROBABLE CAUSE THAT WAS SUBMITTED TO SECURE A
SUBSEQUENTLY ISSUED SEARCH WARRANT FOR THE SAME
ADDRESS, AND THUS, RESULTING IN A DECISION CONTRARY TO
AND/OR AN UNREASONABLE APPLICATION OF CLEARLY
ESTABLISHED FEDERAL LAW.

GROUND TWO: THE PETITIONER'S STATEMENTS WERE
INVOLUNTARY, TAKEN IN VIOLATION OF HIS FIFTH AMENDMENT
CONSTITUTIONAL RIGHT NOT GIVE EVIDENCE AGAINST HIMSELF,
AND THEREFORE, THE STATEMENTS SHOULD NOT HAVE BEEN
ADMITTED IN EVIDENCE AT TRIAL, AND THUS, THE STATE
COURT'S DECISION IS CONTRARY TO AND/OR AN UNREASONABLE
APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR
AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF
THE EVIDENCE PRESENTED.

GROUND THREE: THE TRIAL COURT'S FAILURE TO INSTRUCT THE
JURY THAT IT COULD REJECT THE STIPULATIONS THAT WERE
READ INTO THE RECORD DENIED PETITIONER OF HIS SIXTH
AMENDMENT RIGHT TO A FAIR TRIAL.

Underdue-I, Docket Entry No. 4, at 6-20.

**IV.  GROUNDS II AND III MERIT NO HABEAS RELIEF**

   **1.  Petitioner's Miranda Challenges Are Facially Meritless**

   During Petitioner's direct appellate proceedings, the

Appellate Division stated, with regard to his Miranda challenges:

[Petitioner] claims that his "will was overborne" by
[Wilson and Folks] and that the place of
interrogations, . . . a Florida jail, and . . . the
Camden County Prosecutor's Office, were "inherently
coercive."  We reject these arguments and conclude
[Petitioner's] statements were properly admitted.  . .
. Our review of the [trial court's] decision to admit
[Petitioner's] statements is limited to considering
whether, viewing the totality of the circumstances,
there was "sufficient, credible, evidence" that [he]
voluntarily waived his Miranda rights.  The evidence
[of his waiver] is substantial, and the arguments
raised by [him] are without . . . merit . . . .

Id. at *16-17 (citations and brackets omitted).

   Here, Petitioner asserts that the Appellate Division's

ruling was an unreasonable application of Supreme Court

precedent.  His discussion of the events is exceedingly

lengthy and, for the reasons not entirely clear to this
Court, includes a multitude of facts having absolutely no
relevance to the issue of his waiver.  Indeed, addressing
his interviews by Wilson and Folks, Petitioner merely
asserts that each of them informed him of his <u>Miranda</u> rights
and each of them stated to Petitioner (during the respective
interview) that they did not believe his stories (one about
how Petitioner allegedly went with Mora-Batista to a park
for a stroll and to sit on the bed sheet, and then just left
the bed sheet with Mora-Batista, and another story alleging
that Mora-Batista was shot at Petitioner's house by
Petitioner's unidentified "friend" and two men who,
regardless of being wholly unknown to Petitioner, were
nonetheless allowed by Petitioner to come into his house and
conduct their drug transactions there).  <u>See</u> <u>id.</u> at 15-17.

Petitioner also alleges that Folks advised Petitioner
that telling the truth was in Petitioner's best interests.
<u>See</u> <u>id.</u> at 17.  Quoting the trial judge's finding that
Petitioner's statements to Folks and Wilson were voluntary,
<u>see</u> <u>id.</u> at 19, Plaintiff now contests that finding because:
(a) the trial judge made no express mentioning of the
totality of circumstances test governing <u>Miranda</u>-based
challenges; and (b) Petitioner is of the opinion that his
will had to be "overborne" by "police coercion" in the form

18

of Wilson and Folks' statements (that Petitioner's stories were not believable and that it was in Petitioner's best interests to tell the truth).  See id. at 20.

Petitioner's position is facially without merit.  The Court of Appeals explained what it means for a statement to be made involuntarily:

> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion."  Arizona v. Fulminante, 499 U.S. 279, 288 (1991).  In determining whether a statement is voluntary, Supreme Court precedent requires [the court's] consideration of [rather than the utterance of the phrase] "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  These surrounding circumstances include "not only the crucial element of police coercin, [provided that such coercion is actually present,]" but . . . also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health."  Withrow v. Williams, 507 U.S. 680, 693 (1993) (some internal citations omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  Thus, the focus of a Miranda analysis is not whether or not the physical surroundings are "inherently coercive": the focus is on the presence of actual coercion, the process of interrogation and the personal circumstances of the interrogated suspect.  See id.

19

Hence, to introduce into evidence a suspect's statement made during custodial interrogation after the suspect's entry of a waiver, the prosecutor must reflect on these factors and establish, by a preponderance of the evidence, that the waiver was knowing, voluntary and intelligent. <u>See Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986). Since this test poses a relatively low bar for the prosecution, a suspect's statement following <u>Miranda</u> warnings is rarely deemed involuntary, <u>see Dickerson</u>, 530 U.S. at 444, and an express written waiver of <u>Miranda</u> rights is deemed a strong proof that a waiver is valid. <u>See North Carolina v. Butler</u>, 441 U.S. 369, 377 (1979).

Here, Petitioner was administered his <u>Miranda</u> rights *twice* and *twice* executed the waiver. No statement in his Petition suggests, moreover demonstrates, that his will was overborne to the degree necessary for a finding of involuntariness. Short of Petitioner's self-serving assertion that the jail or prosecutor's office environment were "inherently coercive," the Petition contains no fact of coercion. Moreover, Petitioner was an adult at the time of questioning, he was also someone who had extensive exposure to law enforcement system (being arrested and investigated on Florida and New Jersey terroristic-threat charges prior to the interviews conducted by Wilson and Folks), and he was

20

not interrogated for an unduly long time or under unduly harsh circumstances.  While he might have been displeased with the jail or prosecutor's office environment of his interviews, or disappointed with Wilson's and Folks' refusal to believe his continuously changing stories, or he might have preferred not to be reminded that telling the truth was in his best interest, such preferences, displeasures or disappointments contain not an iota of indication that his "will was overborne in such a way as to render his confession the product of coercion," or that his waivers were involuntary.  <u>Fulminante</u>, 499 U.S. at 288.  Thus, the trial court's analysis of the totality of circumstances, and the Appellate Division's affirmance of that analysis was not an unreasonable application of Supreme Court precedent. Accordingly, Petitioner's Ground II warrants no relief.[8]

### 2.   Jury Instruction Challenges Are Without Merit

During his direct appellate proceedings, Petitioner contended that the trial court's instruction to the jurors, "You have to accept the contents of each of those four

---

[8]   Contrary to Petitioner's position that the trial court's analysis had to be deficient simply because the trial court did not utter the phrase "totality of circumstances," a lack of such utterance is irrelevant for the purposes of this Court's review. The law does not put form over substance, and the correctness of the state courts' totality-of-circumstances analyses cannot be affected by the trial court's election to resort to other words.

stipulations as being true," was erroneous, and the trial judge's reference to potential snowfall coerced the jurors into reaching an insufficiently deliberated verdict.  <u>See</u> <u>Underdue</u>, 2008 N.J. Super. Unpub. LEXIS 1795, at *19.  The Appellate Division *agreed* with Petitioner's position that the instruction was erroneous, <u>see</u> <u>id.</u> at *19-20 ("the judge's instruction regarding the stipulation was improper" because "if facts are stipulated, the judge should not tell the jurors that they are 'bound' by such stipulated facts"), but concluded that the error was harmless.  <u>See</u> <u>id.</u> ("A faulty jury charge will not result in reversible error . . . if it 'does not constitute directing a verdict,' and is otherwise ameliorated by proper charges advising 'the jury that it was required to find every element of every charge proven beyond a reasonable doubt in order to convict defendant, that the burden never shifts to the defendant, and that the State has the burden of proving defendant guilty beyond a reasonable doubt'") (citation omitted).

Since "the facts contained in the stipulations . . . did not relate specifically to any necessary element of the crimes with which [Petitioner] was charged, [and] the judge appropriately charged the jury in all other respects as to the elements of the various crimes," the Appellate Division ruled that "the State's burden of proof, and the presumption

22

of innocence" were left intact and "serve[d] to remove any doubt that the jury was led astray by the faulty charge as to the stipulations." Id. at 20-21.[9]

Granted that the Appellate Division's decision *agreed* with Petitioner's claim that the trial court's instruction was erroneous, Petitioner's Ground III raised here ("the trial court's failure to instruct the jury that it could reject the stipulations that were read into the record [violated Supreme Court precedent") is facially inapposite to the Appellate Division's finding. In other words, because this finding was a conclusion that the error committed by the trial judge was harmless, the sole claim Petitioner could conceivably raise here (with regard to the instructions the trial judge gave as to the stipulations) is that the error was *not* harmless. And, indeed, Petitioner is seemingly aiming to raise that very claim. See Underdue-I, Docket Entry No. 4, at 22 ("the Appellate Division held that

---

[9] As to the trial judge's comment about potential snowfall, the Appellate Division ruled that there was "nothing coercive about [the comment which was] made before any deliberations commenced and not in the context of interrupting ongoing deliberations. . . . [T]he judge was [simply] attempting to accommodate the needs of the jury." Underdue, 2008 N.J. Super. Unpub. LEXIS 1795, at *21. Here, Petitioner did not expressly attack that finding. Thus, it shall suffice to state that the Appellate Division's conclusion did not violate any Supreme Court precedent since no Supreme Court holding bars the trial court from accommodating the jurors' needs, including the jurors' concern about weather conditions.

. . . the faulty jury instruction did not warrant reversal.
However, [P]etitioner submits that [this] decision is . . .
an unreasonable application of clearly established [Supreme
Court precedent]").

    In light of the fact that this Court is in the position
to distill the true nature of Petitioner's Ground III with a
sufficient degree of clarity, the discrepancy between
Petitioner's Ground III, as officially stated, and his
Ground III, as clearly intended, is not significant enough
to prevent this Court's examination of this claim on the
merits.

> An error in the jury instructions is not grounds
> for habeas relief if the error is harmless. Yohn
> v. Love, 76 F.3d 508, 522 (3d Cir. 1996). An
> error is harmless unless it "had substantial and
> injurious effect or influence in determining the
> jury's verdict." Brecht v. Abrahamson, 507 U.S.
> 619, 637 (1993). In determining whether there is
> harmless error, [the court must] examine the
> impact of the error on the trial as a whole. [See]
> Yohn, 76 F.3d at 523. Thus, [the court must] ask
> whether the error had a substantial influence on
> the verdict [assessed in light of evidence
> unrelated to] the error. Id.

Pagliaccetti v. Kerestes, 581 F. App'x 134, at *4-5 (3d
Cir. 2014).

    Here, Petitioner's Ground III is based on four
stipulations: (a) that Mora-Batista died from gunshot
wounds; (b) that bullets and bullet fragments were recovered
by the investigators; (c) that forensic specimens obtained

from Petitioner's house tested positive for the presence of blood; and (d) that the DNA tests of these specimens came out inconclusive.  Not one of these stipulations affected the State's burden of proof as to establishing that Petitioner committed Mora-Batista's homicide.  Thus, these stipulations could not have had a substantial influence on the verdict, especially in light of the voluminous evidence that implicated Petitioner in the homicide.  Hence, construed as a challenge to the Appellate Division's finding (that the trial court committed a harmless error), Petitioner's Ground III merits no relief because *that* finding was not an unreasonable application of Supreme Court precedent.

### 3.    Certificate of Appealability

This Court must now determine whether a certificate of appealability should issue as to Petitioner's Grounds II and III.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).  Here, as the foregoing discussion illustrates,

Petitioner Grounds II and III, regardless of their volume, failed to make a substantial showing of the denial of a constitutional right. The Court is persuaded that jurists of reason would not disagree with this Court's conclusions. Correspondingly, no certificate of appealability will issue as to these Grounds.

## V.    GROUND I IS DIVORCED FROM THE STATE COURT'S FINDINGS

Unlike Petitioner's Ground III, which reveals a litigation intent that could be harmonized with the Appellate Division's findings, Petitioner's Ground I cannot be so harmonized. Addressing Petitioner's challenge to the trial court's denial of his motion to suppress Additional Evidence, the Appellate Division stated:

> [Petitioner] advances three arguments in support of the claim that his motion was improperly denied. First, he argues that since the judge initially determined that the information Wilson included in the affidavit itself did not justify the warrantless entry of the premises, it was error for the judge to consider paragraphs V., W., and X. of the affidavit in determining whether probable cause existed. [Petitioner] next argues that the judge abused his discretion in "permitting the state to elicit testimony supplemental to the affidavit." Lastly, [Petitioner] contends the judge abused his discretion in finding Wilson's entry into the premises was justified under the emergency aid doctrine exception to the warrant requirement.

> [Petitioner] misapprehends much of the judge's ruling. It is apparent that the judge initially did not consider the contents of paragraphs V., W., and X. at all, and made his decision as to probable cause without any reliance upon the "warrantless intrusion evidence" contained in those three paragraphs of the affidavit.

26

Moreover, even after Wilson testified, the judge concluded that the balance of the information contained in the affidavit, excising those three paragraphs, was obtained independently of the entry into the premises and demonstrated sufficient probable cause for the warrant.

We find no procedural error in the judge's decision permitting the State to supplement the record through Wilson's testimony.  In fact, in light of what was revealed – the chronology of when she received certain information vis-a-vis when she entered the premises – the testimony was critical to a thorough review of the issues presented.  [Petitioner] actually benefited from the hearing because it forced the State to justify the issuance of the warrant in light of the actual temporal sequence of events, something that was not obvious from the affidavit itself.

We believe the issue is fully resolved by utilizing the guidance provided in State v. Holland, 176 N.J. 344, 823 A.2d 38 (2003), where the Supreme Court [of New Jersey] held

> [W]e adopt the following framework to be applied when evaluating the independent-source doctrine . . . .  First, the State must demonstrate that probable cause existed to conduct the challenged search without the unlawfully obtained information.  It must make that showing by relying on factors wholly independent from the knowledge, evidence, or other information acquired as a result of the prior illegal search.  Second, the State must demonstrate in accordance with an elevated standard of proof, namely, by clear and convincing evidence, that the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed.  Third, regardless of the strength of their proofs under the first and second prongs, prosecutors must demonstrate by the same enhanced standard that the initial impermissible search was not the product of flagrant police misconduct.

Id. at 360-61.

Viewed in this light, we agree that the motion was
properly denied.

First, excising paragraphs V., W., and X. from the
affidavit still leaves an abundance of probable cause
that justified the warrant's issuance.  We need not
recite all the facts again.  Second, the State would
have sought a warrant after Wilson conducted her
further interviews of the various witnesses even if she
never went inside 1135 South 8th Street.  This
conclusion is compelled by the fact that Wilson
actually conducted the interviews after she made the
warrantless entry and included this information in the
affidavit prior to actually seeking the warrant.
Third, Wilson's conduct was not a flagrant abuse of her
power.  The judge concluded that she acted in
accordance with the emergency aid doctrine . . . .  We
decline the opportunity to address whether application
of the doctrine provides a separate rationale for
denying the motion. . . .  The motion to suppress was
properly denied.

Underdue, 2008 N.J. Super. Unpub. LEXIS 1795, at *11-15 (original

brackets and footnote omitted).

Hence, the Appellate Division made two, and only two

determinations (collectively, the "State Court Ruling"), namely,

that: (a) the trial judge correctly concluded that Wilson had

sufficient probable cause to seek a search warrant even before

her warrantless entry; and, in addition, (b) since Wilson would

have swiftly conducted additional follow-up interviews regardless

of her warrantless entry, and those follow-up interviews would

have provided additional probable cause for a search upon a

warrant, and that hypothetical search would have been executed at

the very same time when the actual search warrant was executed,

such search would have produced the very same Additional

Evidence.

Since the scope of federal habeas review is limited to, and

only to, the issue of whether the decision of the highest level

of the state court that ruled on the issue on the merits was an

unreasonable application of the governing United States Supreme

Court precedent, Petitioner may attack only *that* State Court

Ruling if he wants to challenge the admissibility of Additional

Evidence.[10]   In other words, the only challenge he may raise here

(as to the admissibility of Additional Evidence) is the claim

that his trial lacked fundamental fairness because of the trial

---

[10]   Moreover, such an attack should establish that admission
of Additional Evidence rendered Petitioner's trial fundamentally
unfair.   "[T]he Due Process Clause does not permit the federal
courts to engage in a finely-tuned review of the wisdom of state
evidentiary rules."   Marshall v. Lonberger, 459 U.S. 422, 438
(1983).   The admissibility of evidence is generally a question of
state law which is not cognizable under habeas review.   See
Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A
federal habeas court . . . cannot decide whether the evidence in
question was properly allowed under the state law of evidence");
Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978).   "To prevail
on his due process claim, [Petitioner] must prove that he was
deprived of 'fundamental elements of fairness in [his] criminal
trial."   Glenn v. Wynder, 743 F.3d 402, 407 (3d Cir. 2014)
(quoting Riggins v. Nevada, 504 U.S. 127, 149 (1992)) (citation
and internal quotation marks omitted).   The Supreme Court has
"defined the category of infractions that violate 'fundamental
fairness' very narrowly, based on the recognition that, beyond
the specific guarantees enumerated in the Bill of Rights, the Due
Process Clause has limited application."   Medina v. California,
505 U.S. 437, 443 (1992).   "In order to satisfy due process,
[Petitioner's] trial must have been fair; it need not have been
perfect."   Glenn, 743 F.3d at 407 (citing United States v.
Hasting, 461 U.S. 499, 508 (1983)).

judge findings that: (a) Wilson had sufficient probable cause to seek a search warrant before her warrantless entry (even if she did not act on that probable cause or had concerns with sufficiency of her probable cause); and (b) a search upon a warrant would have been conducted anyway (on the basis of the information Wilson would have obtained from her follow-up interviews) and that search would have produced the very same Additional Evidence.

Petitioner, however, did not raise *that* challenge in his Ground I (which aims to attack the admissibility of Additional Evidence). Rather, ignoring the actual State Court Ruling, Petitioner raises a qualitatively different attack. He first asserts that the trial court must have found that the search was illegal (because the warrant contained, <u>inter alia</u>, the information Wilson obtained upon her warrantless entry). Then he asserts that the trial judge admitted evidence produced by that adjudicated illegal search. Finally, he claims that the trial judge attempted to establish the validity of the warrant by focusing on the information Wilson obtained during her warrantless entry and testified to.[11]   Yet, the State Court

---

[11]   Specifically, Petitioner states that

the state court erred in failing to suppress illegally evidence seized under the "fruit of the poisonous tree" doctrine, and circularly, permitting the prosecutor to supplement the record with in-court testimony

Ruling never made any of the findings Petitioner attacks.
Indeed, the State Court Ruling: (a) expressly factored out the
information that Wilson obtained during her warrantless entry;
and (b) focused *exclusively* on the information Wilson had before
her warrantless entry (for the purposes of establishing that the
warrant was duly issued) and on the information Wilson would have
discovered anyway upon conducting her follow-up interviews.

Since Petitioner's attack on the admissibility of Additional
Evidence (as stated in his Ground I) and the attack that he could
mount here on the basis of the State Court Ruling are wholly
incongruent (having, effectively, nothing in common short of the
mere fact that both relate to Additional Evidence), this Court is
not in the position to conduct a § 2254 analysis of whether the
state court's decision was an unreasonable application of Supreme
Court precedent.  In other words, Petitioner's Ground I, as
drafted, invites this Court to assess the reasonableness of the
findings the state courts did not make.  That this Court cannot
do.  All this Court can do is to assess the reasonableness of the

---

concerning an antecedent illegal warrantless search of
a residence improperly supplemented the "four corners"
of an affidavit of probable cause that was submitted to
secure a subsequently issued search warrant for the
same address, and thus, resulting in a decision
contrary to and/or an unreasonable application of
clearly established federal law.

Underdue-I, Docket Entry No. 4, at 20 (capitalization removed).

State Court Ruling, nothing more and nothing less.  Hence, this Court finds it warranted to allow Petitioner an opportunity to paraphrase his Ground I into a challenge attacking the State Court Ruling, as detailed <u>supra</u> by stating the factual predicate in support of *that* attack.[12]

> "Habeas corpus petitions must meet heightened pleading requirements," <u>McFarland v. Scott</u>, 512 U.S. 849, 856 (1994), and Habeas Rule 2(c) requires a petitioner to "state the facts supporting each ground." 28 U.S.C. § 2254 Rule 2(c)(2) . . . . [Thus, Petitioner must] detail[] the legal challenge and supporting factual predicate of each claim . . . .

<u>Jones v. United States</u>, 2014 U.S. Dist. LEXIS 101272, at *2-4 (D.N.J. July 24, 2014).[13]

In the event Petitioner duly details his facts in support of such challenge, this Court will direct Respondents to answer it on the merits and will allow Petitioner an opportunity to traverse.  Once this Court resolves that challenge on the merits, the Court would conduct its certificate of appealability analysis as to that challenge.  In the interim, this Court's certificate-of-appealability decision will remain reserved, and <u>Underdue v. Att'y Gen.</u>, Civil Action No. 13-5486, will be placed in administrative termination, subject to restoration to this

---

[12]  Petitioner is strongly cautioned against stating facts and raising arguments unrelated to the State Court Ruling.

[13]  In the event Petitioner has no facts to support the sole claim he could raise in his Ground I, he may elect to withdraw that Ground.

Court's active docket in the event Petitioner timely files his written statement setting forth the facts in support of his duly paraphrased Ground I.

## VI.  CONCLUSION

For the foregoing reasons, Petitioner's Grounds II and III will be dismissed, and no certificate of appealability will issue as to those Grounds.  Petitioner will be allowed an opportunity to paraphrase his Ground I challenges so it would correspond to the actual findings made by the Appellate Division, provided that Petitioner states his facts in support of those paraphrased challenges.  This Court will reserve its determination as to Petitioner's Ground I and the ensuing certificate of appealability analysis.

An appropriate Order follows.

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

Dated: January 7, 2015