<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| RUDY V. UNDERDUE, | : | |
| | : | Civ. No. 13-5486 (RMB) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| WILLIE BONDS, Administrator, | : | |
| South Woods State Prison, and | : | |
| JOHN J. HOFFMAN, Acting | : | |
| Attorney General of New Jersey, | : | |
| | : | |
| Respondents. | : | |

**BUMB**, District Judge

    Petitioner Rudy V. Underdue ("Underdue"), an inmate confined in South Woods State Prison in Bridgeton, New Jersey, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (Pet., ECF No. 1.) The Court dismissed Grounds Two and Three of the Petition and allowed Underdue to amend Ground One of the Petition. (Opinion, ECF No. 10.)

    This matter is before the Court upon Underdue's Amended Habeas Petition. (Am. Pet., ECF No. 12.) After a jury trial in the New Jersey Superior Court, Law Division, Camden County, Underdue was convicted and sentenced for first-degree aggravated manslaughter, second-degree possession of a firearm for an unlawful purpose, third-degree possession of a firearm, and third-degree hindering of

apprehension. State v. Underdue, 2008 WL 4998724 (N.J. Super. Ct. App. Div. 2008) cert. denied 198 N.J. 473 (2008). Underdue's direct appeal and petition for post-conviction relief were denied. Id.; State v. Underdue, 2013 WL 362739 (N.J. Super. Ct. App. Div. 2013). He now raises one ground for habeas relief, that his trial lacked fundamental fairness based on the trial court findings that:

> (a) [Investigator] Wilson has sufficient probable cause to seek a search warrant before her warrantless entry (even if she did not act on that probable cause); and (b) a search upon a warrant would have been conducted anyway (on the basis of the information Wilson would have obtained from her follow-up interviews) and that search would have produced the very same Additional evidence.

(Am. Pet., ECF No. 12 at 3.) Respondents filed an answer to the habeas petition. (Answer, ECF No. 14.)

I.   BACKGROUND

The New Jersey Superior Court Appellate Division made the following findings of fact on Underdue's direct appeal:

> On August 31, 2003, Investigator Diane Wilson of the Camden County Prosecutor's Office applied to a judge of the Superior Court for a search warrant to conduct "[a] complete forensic search" of 1135 South 8th Street, Camden, later revealed to be defendant's residence. In her affidavit, she noted that on August 30, Camden police responded to a report of blood dripping from a 1990 gray Honda Accord parked at Broadway and Mt. Vernon Street. The police noticed an odor of decomposition and numerous flies buzzing around the trunk, and when they opened it, they discovered a human

2

body, later identified as Richard Mora-Batista, wrapped in a sheet. He had been shot multiple times.

Wilson detailed how police discovered the victim's name through a missing persons report filed in Bronx, New York, by the victim's girlfriend, Letty Bonilla. Bonilla went to Camden and when interviewed by the police told them that Mora-Batista went to Camden on August 26 to meet with someone known to her only as "Rudy." Bonilla pointed out 1135 South 8th Street as Mora-Batista's intended destination. According to Bonilla, after squabbling over the price of a kilogram of cocaine that he had supplied to Rudy the day earlier, Mora-Batista went to Camden to reclaim the drugs armed with a handgun. Another witness who accompanied Bonilla, Diocelin Berroa, told the police that the victim was using the gray Honda Accord in Camden.

Police officers spoke to a witness, Luis Legarde-Rios, who lived at 1137 South 8th Street and who identified a photo of the victim as someone who frequently visited the house next door in a 1990 Honda Accord. Legarde-Rios claimed that Mora-Batista usually carried packages into the house, stayed only ten to fifteen minutes, and always left. On August 26, however, he saw Mora-Batista arrive as usual but never saw him leave the house. Later, he saw two other males enter the house. Legarde-Rios left for a short time, and when he returned to his home sometime late in the afternoon of August 26, his neighbor, Rudy, gave him his cell phone number and asked that Legarde-Rios call if he saw any investigative activity by the police in the neighborhood.

Legarde-Rios then saw Rudy and his girlfriend, Vicki, whose full name was Victoria Caban, place two large boxes in a white truck owned and driven by Vicki. On August 29, Legarde-Rios saw Rudy and two other men arrive at 1135 South 8th Street

in the white truck, and he overheard Rudy tell
the men to remove the living room carpet and call
him when they were done. Legarde-Rios saw Rudy
return later that evening, change the locks on
the front door of the house, and carry the
rolled-up carpet into the white truck. Wilson
interviewed the maintenance supervisor for the
landlord of 1135 South 8th Street who told her
that new carpeting had been installed in the
apartment approximately one month earlier.

Also on August 29, the police spoke to Vicki's
former boyfriend who told them that she had told
him she was nervous and scared because something
had happened at the house. Wilson learned this
on August 31, and being concerned for Vicki's
well-being, she proceeded to 1135 South 8th
Street. In the final three substantive
paragraphs of the affidavit, Wilson described
what happened when she and several Camden police
officers went to the premises.

> V.... There was no answer in response to
> a knock at the front door at which time all
> proceeded to the rear of the residence
> where the back door was noted to be
> partially open. Because the partially
> opened door was suspicious in light of all
> of the circumstances known to the law
> enforcement officers present, we entered
> the residence after announcing our
> presence with weapons drawn searching for
> [Vicki], calling out her name as we
> proceeded.

> W. Proceeding from room to room we
> ascertained that there was no one present
> within the residence.

> X. While moving through the residence the
> affiant noted that the living room was not
> carpeted, and that in the one [ ] upstairs
> bedroom, a fitted sheet that appeared to

4

match the flat sheet in which the body of
Richard Mora-Batista had been wrapped, was
on the bed with items apparently gathered
within it. Nothing within the residence
was touched or disturbed, and, after
ascertaining the [Vicki] was not within
the residence, all police officers
immediately withdrew through the rear.

The search warrant was issued, and on September
1, 2003, Wilson and other investigators
returned to the premises and conducted a
complete forensic search, seizing the bed sheet
and other evidence.

Defendant was ultimately indicted and charged
with Mora-Batista's murder and other related
offenses. Defendant's motion to suppress was
heard on August 8, 2006. He argued that Wilson's
warrantless entry into the premises was
unjustified and that if the information
contained in paragraphs V., W., and X. was
excised from the affidavit, the State had failed
to demonstrate probable cause for the issuance
of the warrant. The judge agreed that based upon
"the four corners of the document," Wilson's
warrantless entry of the premises could not be
justified; however, he also concluded that
"based upon the affidavit without that
warrantless intrusion evidence included," the
affidavit contained sufficient probable cause
to justify the issuance of the warrant.

Over the objection of defendant, however, the
judge offered the State the opportunity to
present Wilson's testimony to supplement the
affidavit and establish justification for the
warrantless entry of 1135 South 8th Street. In
all material respects, Wilson's testimony
regarding the homicide and the investigation
she conducted prior to August 31 mirrored what
was contained in the affidavit. She further
testified that on August 31, sometime between
10:00 a.m. and 11:00 a.m., she went to the
premises believing Vicki's life was in danger.

After knocking at the front door and receiving no response, she moved to the rear door, which was ajar, and observed blood on the "outside back walls of the house." Wilson entered the house with her gun drawn and proceeded to go from room to room looking for Vicki. In doing so, in one of the bedrooms, she saw a sheet that matched the one wrapped around Mora-Batista's body.

Wilson further testified that Camden police had gone to the premises on August 29, but no one was home. She went there on August 30, after dark, and the doors were closed and no one was home. She was unable to notice whether there was any blood on the premises' walls at that time.

During direct questioning from the judge, however, Wilson acknowledged that prior to the warrantless entry on August 31, she knew only what was contained in paragraphs A through I of the affidavit which was based primarily on information supplied by the Camden police. The information contained in the subsequent paragraphs was obtained after she entered the premises, left, secured the house, and interviewed the various witnesses, i.e., Vicki's former paramour, the landlord's maintenance supervisor, and, to a further extent, Legare-Rios, thus obtaining the information contained in paragraphs J through U of the affidavit. Wilson expressed her belief that based solely upon what was contained in paragraphs A through I, she would not have applied for a search warrant, "[b]ecause at the time I did not believe that a crime had occurred in that residence." However, after seeing the blood, entering the premises, and observing the sheet and the missing carpet, Wilson believed she had probable cause for the search warrant even without the further interviews she conducted. She believed the information contained in the other paragraphs of the affidavit "further ... support[ed][her] application and [her] suspicions...."

6

Defendant renewed his argument that in light of Wilson's testimony, after excising the paragraphs regarding the warrantless entry of defendant's home and the more substantial interviews of the witnesses that followed, the affidavit lacked probable cause. The State argued that Wilson's entry into the premises was justified by the "[e]mergency [a]id [d]octrine." Alternatively, the State argued that even if the warrantless entry was improper, Wilson would have conducted the further interviews of the witnesses and that information would have nonetheless found its way into the affidavit, thus supplying requisite probable cause. In short, the State contended probable cause was supplied from "an independent source" unrelated to the warrantless entry.

The judge found Wilson to be a credible witness. He reviewed the contents of paragraphs A through I of the affidavit and observed "there's a reasonable basis to believe that [those paragraphs] might have ... supported a search warrant." However, without concluding definitively that was the case, the judge noted that Wilson knew about Legarde-Rios because he "had previously been interviewed by the [S]tate prior to the entry [of 1135 South 8th Street]," and he "had all this information that had nothing whatsoever to do with the entry into the premises...." The judge reaffirmed his earlier finding that probable cause existed for the issuance of the warrant based on all the information obtained independent of Wilson's entry into the premises. The judge then concluded that the warrantless entry was also justified under the emergency aid doctrine, citing State v. Frankel, 179 N.J. 586, 847 A.2d 561, cert. denied sub nom. Frankel v. New Jersey, 543 U.S. 876, 125 S.Ct. 108, 160 L. Ed.2d 128 (2004). He denied defendant's motion to suppress.

Underdue, 2008 WL 4998724 at *1-4.

On direct appeal, Underdue raised the following issues: (1) "since the judge initially determined that the information Wilson included in the affidavit itself did not justify the warrantless entry of the premises, it was error for the judge to consider paragraphs V., W., and X of the affidavit in determining whether probable cause existed;" (2) "the judge abused his discretion in 'permitting the state to elicit testimony supplemental to the affidavit;'" and (3) "the judge abused his discretion in finding Wilson's entry into the premises was justified under the emergency aid doctrine exception to the warrant requirement." Id. at *4.

First, the Appellate Division held that it was apparent the trial judge initially did not consider the contents of paragraphs V, W, and X, but instead made his decision as to probable cause without any reliance on "warrantless intrusion evidence." Id. Second, the trial judge did not err in permitting the State to supplement the record through Wilson's testimony, which was critical to a thorough review of the issues presented. Id. Third, the Appellate Division stated:

> The judge concluded that [Wilson] acted in accordance with the emergency aid doctrine which "requires that public safety officials possess an objectively reasonable basis to believe . . . that there is danger and need for prompt action." Frankel, supra, 179 N.J. at 599, 847 A.2d 561. We decline the opportunity to address whether application of the doctrine provides a separate rationale for denying the

motion. The judge's findings in this regard, however, are indicative of his conclusion that Wilson's actions were not the product of "flagrant police misconduct." The motion to suppress was properly denied.

<u>Id.</u>

II.   <u>DISCUSSION</u>

A.   <u>Standard of Review</u>

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)). The phrase

9

"clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. <u>Williams</u>, 529 U.S. at 412. An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. <u>Eley</u>, 712 F.3d at 846 (quoting <u>Renico v. Lett</u>, 130 S.Ct. 1855, 1862 (2010)).

B.    <u>Analysis</u>

In support of his habeas petition, Underdue contends  Wilson's testimony that she would not have applied for a search warrant based solely on the information supplied to her by other officers prior to the warrantless entry negates the State Court's finding that Wilson had sufficient probable cause to seek a search warrant before her warrantless entry. (Am. Pet., ECF No. 12 at 4.)

Underdue also contests the State Court's finding that a search upon a warrant would have been conducted on the basis of information Wilson obtained from her follow-up interviews, and the search would have produced the same additional evidence. (<u>Id.</u> at 5.) Underdue argues:

> [T]he fact that Wilson conducted further interviews after the warrantless search solidifies her reason for not seeking a search warrant prior to her warrantless entry. Furthermore, information obtained after a warrantless search is inconsequential as to establishing probable cause prior to said warrantless search. Moreover, as a direct result of the warrantless search, Wilson was

10

> privy to crime facts that should would not have
> otherwise known when she conducted further
> interviews. Consequently, the State Court's
> finding that the search upon a warrant would
> have produced the very same evidence as the
> warrantless search even if Wilson never entered
> the premises is speculative at best.

(Id.) Thus, Underdue contends the State Court findings are an unreasonable determination of the facts in light of the evidence presented, and admission of "otherwise inadmissible evidence" rendered his trial unfair. (Id. at 5-6.)

Respondent asserts that Underdue is not entitled to habeas relief because he is claiming a violation of the Fourth Amendment, but the trial and appellate courts gave him a full and fair opportunity to litigate his Fourth Amendment claims. (Answer at 2-3.) Underdue's motion to suppress was heard by the trial judge on August 8, 2006. (Id. at 3.) Underdue then challenged the trial court's denial of his motion to suppress on direct appeal. (Id. at 7.) Therefore, Respondent contends Stone v. Powell, 428 U.S. 465, 495 (1976) precludes habeas relief. Alternatively, Respondent contends that the State Court findings were not unreasonable. (Answer at 7-12.)

In Stone v. Powell, 428 U.S. 465 at 469, the Supreme Court addressed the important issue of whether:

> a federal court should consider, in ruling on
> a petition for habeas corpus relief filed by a
> state prisoner, a claim that evidence obtained
> by an unconstitutional search or seizure was
> introduced at his trial, when he has previously

11

> been afforded an opportunity for full and fair
> litigation of his claim in the state courts.

The Court held that if the State provided a full and fair opportunity to litigate the Fourth Amendment claim, "the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 482.

The Court noted that the purpose of the exclusionary rule is that it would deter future unlawful police conduct. Id. at 484. Although the courts have an interest in preserving the integrity of the judicial process, this does not always justify exclusion of highly probative evidence. Id. at 485. The justification for exclusion is minimal "where federal habeas corpus relief is sought by a prisoner who previously has been afforded the opportunity for full and fair consideration of his search-and-seizure claim at trial and on direct review." Id. at 486.

The Court weighed the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims. Id. at 489. The costs associated with the exclusionary rule at trial and on direct appeal are diverting the focus of the trial from the central concern of innocence or guilt, and excluding physical evidence that is typically reliable and the most probative evidence bearing on guilt. Id. at 489-90. "[T]he disparity in

12

particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice." Id. at 490.

In the context of federal habeas review after the State provided a full and fair opportunity to litigate the Fourth Amendment claim, the Court found there was minimal "effectuation" of the Fourth Amendment but substantial societal costs to application of the exclusionary rule. Id. at 495. "Even if one rationally could assume that some additional incremental deterrent effect would be presented in isolated cases [by allowing review of Fourth Amendment claims in federal habeas actions],' this would be "outweighed by the acknowledged costs to other values vital to a rational system of criminal justice." Id. at 493-94.

Underdue contends that the admission of "otherwise inadmissible evidence" rendered his trial unfair. Although phrased as a due process violation, his reference to "otherwise inadmissible evidence" is clearly a challenge to the State courts' denial of his motion to suppress the evidence under the Fourth Amendment. "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury.'" Davis v. U.S., 131 S.Ct. 2419, 2426 (2011) (quoting Stone, 428 U.S. at 486) (additional citations omitted)).

Underdue's challenges are directed at the State Court's conclusions rather than whether he was provided a full and fair opportunity to present his claims. Upon review of the transcript of the hearing on his motion to suppress (Transcript of Motion, ECF No. 14-12) and the brief Underdue submitted on direct appeal (Brief and Appendix on Behalf of Defendant-Appellant, ECF No. 14-5) Underdue had a full and fair opportunity to litigate his Fourth Amendment claims in the trial court and on direct appeal. Therefore, Stone v. Powell precludes habeas review of his claim.

## III. CERTIFICATE OF APPEALABILITY

This Court must determine whether Underdue is entitled to a certificate of appealability in this matter. See Third Circuit Local Appellate Rule 22.2. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Underdue has not made a substantial showing, and this Court will not issue a certification of appealability.

## IV. CONCLUSION

In the accompanying Order filed herewith, the Court will deny the habeas petition.

s/Renée Marie Bumb
**RÉNEE MARIE BUMB**
**United States District Judge**

**Dated:** March 22, 2016

14